**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ALEKSANDRA CASTRO,** | § | |
| **LINET KOSHY,** | § | |
| **ALYSSA TORREZ,** | § | |
| **ERIC BARRETTO, and** | § | |
| **KATHERINE COX,** | § | |
| | § | |
| **Plaintiffs** | § | **Case No. ____________________________** |
| | § | |
| **v.** | § | |
| | § | |
| **TEXAS WESLEYAN UNIVERSITY,** | § | |
| | § | |
| **Defendant** | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Now come Plaintiffs Aleksandra Castro, Linet Koshy, Alyssa Torrez, Eric Barretto, and Katherine Cox to file this Original Complaint against Defendant Texas Wesleyan University, and they show the Court as follows:

## I. INTRODUCTION

1. This suit is brought on behalf of five CRNA students who were wrongfully dismissed from Defendant's program as part of Defendant's fraudulent and discriminatory over-enrollment scheme. Plaintiffs raise claims for interference, discrimination, and retaliation in violation of the Americans with Disabilities Act and the Rehabilitation Act, violations of the Texas Deceptive Trade Practices Act (DTPA), common law fraud, negligent misrepresentation, breach of contract, promissory estoppel, and unjust enrichment/restitution, and they request relief for the adverse impacts of arbitrary and capricious academic actions described herein.

## II. PARTIES AND PERSONAL JURISDICTION

2. Plaintiff Aleksandra Castro, MSN, AGACNP-BC, CCRN is an individual residing in Prosper, Texas, who was enrolled as a DNAP student at Texas Wesleyan University during the 2024-2025 academic year. She paid tuition and bore all associated costs of attendance, including lost income. Ms. Castro is a highly credentialed nurse practitioner with nearly two decades of preparation for advanced clinical practice. She was wrongfully dismissed from the DNAP program under the circumstances described below, and she has suffered significant financial loss and career derailment due to her inability to receive a fair process and academic credit for work performed.

3. Plaintiff Linet Koshy, BSN, RN, CCRN is an individual residing in Grand Prairie, Texas, who was enrolled as a DNAP student at Texas Wesleyan University during the 2024-2025 academic year. She paid tuition and bore all associated costs of attendance, including lost income. Ms. Koshy is an experienced ICU nurse with a record of academic excellence and professional leadership. She was wrongfully dismissed from the DNAP program and is experiencing significant ongoing financial, reputational, and career harms.

4. Plaintiff Alyssa Torrez, RN, BSN, CCRN is an individual residing in Thornton, Colorado, who was enrolled as a DNAP student at Texas Wesleyan University during the 2024-2025 academic year. She paid tuition and bore all associated costs of attendance, including relocation and lost income. Ms. Torrez excelled academically and professionally and served as class representative. She was wrongfully dismissed from the DNAP program and has suffered loss of financial aid and professional trajectory, and suffers from ongoing emotional and health impacts.

5. Plaintiff Eric Barretto, BSN, RN, CCRN is an individual residing in Lomita, California, who was enrolled as a DNAP student at Texas Wesleyan University during the 2024-

2025 academic year. He paid tuition and bore all associated costs of attendance, including relocation and lost income. Mr. Barretto, a highly accomplished veteran and critical care nurse, was wrongfully dismissed from the DNAP program, which caused permanent professional limitations and severe financial loss to him and his family.

6. Plaintiff Katherine "Kati" Cox, BBA, RN, BSN, CCRN is an individual residing in Austin, Texas, who was enrolled as a Doctor of Nurse Anesthesia Practice ("DNAP") student at Texas Wesleyan University during the 2024-2025 academic year. She paid tuition and bore all associated costs of attendance, including relocation and lost income. Ms. Cox is a Medical and Neurocritical ICU nurse and patient advocate whose summary, wrongful dismissal by Defendant resulted in loss of tuition, career opportunities, and future income.

7. Defendant Texas Wesleyan University is a private university located in Fort Worth, Texas, and is therefore subject to the personal jurisdiction of the United States federal courts. Texas Wesleyan University may be served with process by delivery to its registered agent, Emily W. Messer, at her registered office, which is located at 1201 Wesleyan Street, Fort Worth, Texas 76105, or at such other place as she may be found, or in any other manner authorized by law or by the Court.

## III. SUBJECT MATTER JURISDICTION and VENUE

8. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiffs' claims for violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

9. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

10. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Defendant resides in this district and because a substantial portion of the

events and omissions giving rise to Plaintiffs' claims occurred in this district.

## IV. FACTUAL BACKGROUND

### A. The Deceptive Over-Enrollment Scheme and Misrepresentations in Recruitment Materials

11. Defendant Texas Wesleyan University operates a deceptive and discriminatory over-enrollment scheme in its Doctor of Nurse Anesthesia Practice ("DNAP") [CRNA] program. Each year it accepts approximately 10% more students than it has contracted second- and third-year clinical site placements available. Students are then abruptly dismissed – often immediately after the final exam in Dr. Schmidt's Anatomy & Physiology course (A&P I and II) – without meaningful notice, numeric grades, exam reviews, or access to records.

12. Upon information and belief, this pattern has recurred for multiple cohorts and violates multiple Council on Accreditation of Nurse Anesthesia Educational Programs ("COA") standards, including A.10 (adequate resources to support program size), F.1 (sufficient clinical resources to ensure every graduate meets all requirements), and G.7 (processes, complaints, grievances, and appeals occur in a timely and equitable manner affording due process). This pattern also violates multiple accreditation standards of the Southern Association of Colleges and Schools Commission on Colleges ("SACSCOC"), including Standard 1.1 (The institution operates with integrity in all matters), 10.1 (The institution publishes, implements, and disseminates academic policies that adhere to principles of good educational practice and that accurately represent the programs and services of the institution), and 10.5 (The institution ensures that its recruitment materials and presentations accurately represent the institution's practices, policies, and accreditation status). Finally, this pattern also violates multiple accreditation standards of the University Senate of the United Methodist Church, including Institutional Integrity (ethical integrity and nondiscrimination), Program Quality (grading and

student supports), and Sound Management (exceeding enrollment allowances and capacity).

13. This program has notable deviations from its peer CRNA programs in its very large cohort size and its requirement that students take 16-17 credit hours in each of their first two semesters, while it knowingly under-resources student support systems. There are highly abnormal attrition rates and patterns in this program due to a specific instructor's two required courses, and the program director's explicit reinforcement of these irregularities.

14. To induce prospective students to purchase Texas Wesleyan University's educational products and services, Defendant has disseminated, or caused to be disseminated, advertisements for its educational products and services in various formats. In its recruitment materials, website, brochures, admissions communications, orientation sessions, other program publications, email communications, and in-person representations, Defendant's employees, agents and/or representatives knowingly misrepresented key program metrics to induce enrollment and continued attendance, including: (a) presenting board passage rates as above average instead of below average; (b) availability of student support services; (c) adherence to accreditation standards, federal laws (including the ADA, Section 504, and the Family Educational Rights and Privacy Act (FERPA) 20 U.S.C. § 1232g), and its own written policies and handbooks; (d) its true attrition rates and approved enrollment limit; (e) instructor credentials; and, (f) the "rigorous" yet fair nature of the program.

15. Since at least 2021, Defendant's advertisements have been widely disseminated throughout the United States including within the state of Texas, and this federal district.

16. These representations were false and unsubstantiated and violated COA Standard G.2 (a critical concern), which requires that "[t]ruth and accuracy are evidenced in recruiting and admissions practices, academic calendars, catalogs, publications, grading, and advertising." Plaintiffs encountered these misrepresentations through Defendant's recruitment materials,

website, brochures, admissions representatives, faculty communications, orientation materials, and other program publications both before enrolling and while enrolled.

17. Plaintiffs justifiably relied upon these false and misleading representations in deciding to enroll in the DNAP program, pay substantial tuition and related expenses, relocate, forgo other educational and career opportunities, and continue their enrollment. Plaintiffs would not have enrolled in the DNAP program, would not have paid the tuition and costs, would not have relocated, and would not have continued their studies had they known the truth about the over-enrollment scheme, the lack of transparency and fairness in grading and record access, the failure to provide reasonable accommodations, Defendant's failure to comply with accreditation standards, the lack of student support services, and the other facts alleged herein. Defendant's misrepresentations were part of a pattern or practice of deceptive acts and practices designed to induce Plaintiffs and others to purchase educational services from Defendant.

18. As a part of this scheme, in its recruitment materials, Defendant pledged specific two-year clinical site placements to each Plaintiff with their acceptance letters, which induced Plaintiffs to select Defendant's program. Upon information and belief, Defendant is the only CRNA program in the nation with this practice, and it is generally not considered appropriate. Clinical sites are highly specialized, competitive, and subject to change year to year. For example, Plaintiff Torrez was initially promised a clinical site assignment in her home city of Denver when she was accepted into Defendant's program. That clinical site was available for her original cohort, but thereafter the site was no longer available because a new CRNA program opened in Colorado, and those clinical placement slots went to the local program instead of to Defendant. Defendant made these promises to the Plaintiffs in exchange for their commitment to the $120,000 program and a non-refundable acceptance fee of $1,500.

19. Defendant's scheme funnels all first-year students through a single-instructor

"gatekeeper" course (Dr. Schmidt's A&P I and II sequence) that issues semester grades based on four or five exams only. Final-exam grades were never posted, although they comprised 25% of each semester grade, and final numeric course grades were never provided. Students were denied accurate, timely mid-term feedback, meaningful exam reviews, itemized grading, and access to their own education records in violation of published policies, accreditation standards, FERPA, and reasonable standard academic norms. In stark contrast to most universities, no tutors, remediation, or second instructors were provided for this course despite the unusually high attrition rate (all or nearly all program academic dismissals are tied to this one first-year course).

20. At all relevant times, Defendant Texas Wesleyan University dominated or controlled the acts and practices of its internal department, the DNAP Program, including the implementation of its marketing campaign, the improper grading practices, and the unlawful withholding of education records; knew of or approved of those acts and practices; and/or benefitted from those acts and practices. As shown below, there is evidence that Defendant disseminated and/or controlled the dissemination of the challenged advertisements and had knowledge of their falsity.

21. Upon information and belief, based on information uncovered by Plaintiffs in the preparation of their academic appeals, high-level corporate officers and executives of Defendant Texas Wesleyan University knew the claimed board passage rates, attrition rates and patterns, student support systems, clinical placements, and other claims of program quality were false and / or made with reckless disregard for the truth and nonetheless continued to exploit the false and deceptive CRNA program marketing campaign, highlighting its false claims as a deliberate strategy to boost student enrollment over capacity and maximize revenue for Defendant.

**B. Plaintiffs' Disabilities and Defendant's Interference**

22. Plaintiffs Castro, Koshy, Torrez, Barretto, and Cox each disclosed to and/or were

known by Defendant to have learning, mental health, or related disabilities, for which reasonable accommodations were necessary or required in the classroom, testing, and related educational proceedings. Four of these Plaintiffs received confirmed accommodations from the University's ADA/504 office; all formally or informally advised faculty of their disability-related needs and sought reasonable measures to ensure equal academic participation.

23. Plaintiffs requested specific accommodations pursuant to the ADA and Section 504, including but not limited to: extended time for exams, private or alternative testing environments, and disability-sensitive education records review or appeal procedures.

24. Defendant's records confirm that Plaintiffs Koshy, Torrez, Barretto, and Cox, were recognized by Defendant as eligible for and entitled to such accommodations.

25. During the Fall semester, Plaintiff Castro experienced a sudden acute illness. She provided MRI results to Professor Schmidt and relied on his syllabus and the program's webpage (official university documents) to request accommodations. Defendant's official materials stated, "Students must notify instructors of any permanent or temporary disabilities and must provide documentation regarding those disabilities prior to the granting of an accommodation." Dr. Schmidt acknowledged the need but told her that even if she went to disability services, he could not accommodate her in the class. He misdirected her at a critical time.

26. Because Defendant did not allow make-up exams for any reason, Plaintiff Koshy had no choice but to take the first A&P exam in the Spring 2025 semester within a few days of a major medical emergency. After she took the exam, she went to the instructor, Dr. Schmidt, reported the medical emergency, and requested remediation or extra credit to help her grade. He denied her request and he did not direct her to the disability office. She continued to meet regularly with him throughout the remainder of the semester, and he repeatedly told her that he had no concerns for her failing the class. He told her, 'Continue to do what you are doing, re-

listen to my lectures over and over again, and you will be fine.'

27. After their dismissals, Plaintiffs Castro, Koshy, Torrez, Barretto, and Cox were similarly denied accommodations for records inspections and meaningful appeal preparation processes because Defendant falsely asserted that the ADA / § 504 framework did not apply to former students seeking accommodations to access their own education records.

28. Defendant allowed its instructor and program to maintain a syllabus and course website that contradicted its handbook policies and federal law. Defendant did not enforce its faculty's obligation to direct students experiencing health issues to disability services. Defendant allowed its instructor to improperly interpret medical information, make medical decisions, and deny access to the ADA compliance officer. Defendant, through its administrators, faculty, and ADA coordinator, failed to properly route, consider, initiate, or implement appropriate accommodations, failed to provide a pathway, and interfered with the exercise of rights, which resulted in Plaintiffs being disproportionately disadvantaged in their assessments, appeals, and interactions with DNAP program faculty. These failures also violated COA Standard G.4, which requires "policies and procedures that are fair, equitable, and do not discriminate."

### C. Lack of Transparency: Missing Grades, Records Access, Reuse of Exams, Records Tampering, and Retaliation

29. During the program, Defendant repeatedly denied Plaintiffs access to the critical graded A&P exams, graded scratch papers, and original scoring, curve, and grading records, despite timely, repeated, specific requests (including through counsel and the ADA/504 office). This violated FERPA and compounded disability-related disadvantages during appeals. After notice of intent to appeal the dismissals, Defendant engaged in retaliatory delays, denials, condescension, and disparagement of students' characters and fitness, all while disregarding Plaintiffs' demonstrated excellence in all of the courses without these irregularities and all other

aspects of their distinguished nursing careers, personal backgrounds, and military service.

**1. Missing Grades**

30. The final exam grades for the A&P I & II courses were never posted into the Canvas system. For both semesters, the final exam was 25% of the total grade. Plaintiffs' final letter grades in RamLink appear to correspond to their numeric grade in Canvas, with no credit at all for the final exam, for both semesters.

31. The final semester grades should have not been entered into RamLink with 25% of the semester grades missing in Canvas. All of each course's grades should be in the same place and readily accessible by students.

32. Plaintiffs were dismissed without their full grades being properly calculated because 25% of two different semester grades were missing from the grades listed in Canvas and RamLink. The basis for the final and mid-term grades were not produced to the Plaintiffs who requested their education records under FERPA.

33. In mid-June 2025 when the Plaintiffs communicated their intent to appeal and attempted to exercise their rights to inspect their records, Defendant cut off access in Canvas to only their A&P courses, except for Plaintiff Cox, whose Canvas access was cut off completely.

34. Regularly missing grades for this course were part of a generally accepted pattern and practice in Defendant's DNAP department. The program's administrators and faculty allowed and reinforced these substantial deviations from standard practices only in this course.

35. In a text group chat of the students, while discussing the lack of access to Dr. Schmidt's graded exams, one student replied to Plaintiff Castro, "The dirty secret is this: We all did [fail the fall semester final A&P exam]. There's a reason you never see the final score for this exam."

36. These policies, patterns, and practices systematically violate Defendant's own

Faculty Handbook, 5.1.1, which states that "Faculty must also keep accurate records of students' [...] grades. It is the policy of the University to maintain records from students completing coursework, including specifics of how the course grades were earned, for a period of no less than one year after the completion of the course." On page 10 of the course syllabus, Defendant affirmed student access to records and outlined a formal grade appeal protocol.

37. Also missing were Plaintiffs' mid-term grades, which were never posted as required by Defendant's policies for compliance with federal regulations and accreditation standards. Defendant's Faculty Guide Policy 2.1.3.6, Grading, requires that all mid-term grades of D or F must be posted timely so students will be accurately informed of their standing in their classes. Plaintiff Koshy received a low grade on the first exam of the spring semester taken shortly after a major medical emergency, and she was later told that her final exam grade was significantly higher, but not enough to overcome the earlier A&P II Exam 1 grade. However, like the others, her A&P II mid-term grades were never posted.

**2. Records Access and Reuse of Exams**

38. Dr. Schmidt repeatedly told students in recorded lectures that he would be completely unavailable to them in the days leading up to each exam because he would be self-isolated while drafting each exam from scratch.

39. However, when Plaintiffs sought to inspect their own education records, Defendant barred them from accessing their exams on the asserted basis of 'test security' because the exams were purportedly reused each year by the instructor.

40. Despite Plaintiff's persistent requests for records access and clarification on this issue, Defendant refused to address the contradictions between the instructor's repeated recorded statements and Defendant's justifications for refusing to allow Plaintiffs to meaningfully access

their own records during both semesters and while preparing their appeals.

**3. Records Tampering**

41. Over the fall and spring semesters, Plaintiffs each received approximately 20 electronic automated systems notifications of modifications to their A&P exam records in Canvas, long after their exams had been taken and grades were released.

42. For examples, for the A&P II Exam 1, taken by students on February 13, 2025, Canvas metadata shows that Dr. Schmidt "created" the exam again on February 15, made grade changes on February 20, created it again on February 22, made grade changes again on March 24, and created it again on March 29. Similar patterns occurred in six of Dr. Schmidt's nine exams. Of the three others, two are the Fall and Spring final exams for which no grades were ever released, despite forming the basis of Plaintiffs' dismissals. Plaintiffs never received notifications that their A&P final exams were ever graded or posted. Only the first exam of the Fall semester does not have these irregularities.

43. Plaintiffs did not receive these types of notifications about *post hoc* records modifications for any other courses in this program or any other program. They did receive regular notifications that the final exams in their other courses were graded and posted.

44. Despite being entitled to accommodations, and that FERPA rights are unconditional, Plaintiffs were denied full and fair opportunities to meaningfully review their own records, to take notes, or to utilize requisite access in connection with their academic appeals and grievance processes. At the time of their dismissals, they were misdirected as to their FERPA rights and the existence of the appeals process. These actions by Defendant interfered with Plaintiffs' due process rights and compounded the negative impact of their disabilities.

45. Defendant's policies and other authorities require that students be notified in writing of the rationale for all changes to grades after they are posted, but Plaintiffs received no

such explanations from Defendant. As a direct result, Plaintiffs were unable to meaningfully investigate or challenge the surreptitious academic decisions leading to their dismissals evidenced by these clear indications of records tampering, and they suffered severe procedural unfairness.

46. Changes to exams after they are administered are usually considered sentinel events that disqualify the exams as accurate evaluation records of student performance. These actions violate SACSCOC accreditation standard 12.5 which requires that the institution protect the security, confidentiality, and integrity of its student records and maintain security measures to protect and back up data. This is a major violation of FERPA which prohibits tampering and requires that students' records are accurate.

### D. Program Deviations from Standard Academic Practices

47. Defendant, primarily through Dr. James Schmidt (DNAP Anatomy & Physiology I and II course faculty) and Dr. Terri Kane (Program Director), engaged in several administrative and academic irregularities, including *ad hoc* post-exam records modifications, unexplained grading curves, inconsistent processes, and refusal to provide itemized grading or exam reviews contrary to federal law, published policies, accreditation standards, and reasonable accommodations for students with disabilities. These practices violated COA Standard G.2 (truth and accuracy in grading), G.5 (academic integrity policies must be defined and used in all educational activities), and H.1.1.3 (faculty advising must provide students with ongoing feedback, both formal and informal).

#### 1. Instructor's Insufficient Credentials

48. Defendant's instructor Dr. Schmidt is the only full-time instructor in the CRNA program who is not a CRNA. Dr. Schmidt came directly into his current teaching position with Defendant immediately after completing his Ph.D in Physiology about 16 years ago. It is

understood by Plaintiffs that Dr. Schmidt's graduate school experience was focused on research using animal subjects, and thus he has had minimal to no human clinical medical experience before or after he began teaching Advanced Human Anatomy and Physiology in Defendant's CRNA program. Unlike his students and most colleagues, Dr. Schmidt is not an RN either.

49. Defendant's policies, accreditation standards, and academic norms require that instructors stay current and advance research in their fields. However, unlike all his other DNAP colleagues, Dr. Schmidt does not list a single publication or research activity on Defendant's webpage. Until September 2025, this same webpage claimed that Dr. Schmidt kept up to date on the CRNA field by attending the annual national and state CRNA conferences. However, Plaintiffs noticed that sometime around October 1, 2025, that his biography on Defendant's webpage was edited to remove all references to his attendance at the conferences.

50. As Defendant's website claims that Dr. Schmidt 'goes beyond the textbook,' and the dismissed students are top nurses who sincerely questioned the soundness of the medicine and science in his courses and exams, the question of the sources of his up-to-date CRNA materials is of utmost importance. However, despite respectful requests during the appeal preparation period, Defendant declined to specify Dr. Schmidt's medical and scientific sources beyond the textbooks, and the years he last attended the national and state CRNA conferences.

51. At Texas Wesleyan, Dr. Schmidt discouraged Plaintiffs from relying on the textbook that he recommended for study, and instead insisted they "trust him" and rely solely on his materials and methods – even though he has no medical background. This created further disconnect between theory and real-world application.

52. There are seven accredited CRNA programs in Texas. Upon information and belief, Defendant operates the only program amongst these whose A&P courses are not taught by a CRNA or MD with extensive human clinical medical experience.

53. Dr. Schmidt lacks the requisite credentials and expertise to properly exercise professional judgment. This situation violates SACSCOC accreditation standard 6.2.a, which requires that the institution justify and document the qualifications of its faculty members. It also violates Defendant's own Faculty Handbook Policy 5.18.1, which states that Graduate Faculty members have high expectations for on-going scientific research and publications.

54. This is also not consistent with other CRNA programs. Professors at peer institutions lecture directly from standard textbooks like Guyton & Hall Medical Physiology (which this program also used) and supplement with clinically relevant examples from their own medical backgrounds to help students connect course content to anesthesia practice. A student from Union University recently stated to Plaintiff Torrez: "Having an A&P teacher who had a medical background was truly invaluable and helped our class immensely in applying both anatomy and physiology to the practice of anesthesia."

**2. Scientific and Medical Invalidity of Course and Exam Content**

55. Defendant deliberately employed an unqualified instructor to run a sham course. In his lectures and exams, Dr. Schmidt often disagreed with the official textbooks and his instructor colleagues in the program about the materials he taught and assessed students on. The manner in which his two courses were taught and evaluated substantially deviated from standard academic practices, show how his deviations were known to and reinforced by the program, and further show how Dr. Schmidt's grading practices were not based in his professional judgment.

56. Dr. Schmidt taught in a manner that insisted only his way was correct, but students were not given any sources to verify that his information was accurate. For example, he disagreed with a calculation in Dr. West's pulmonology book. When Plaintiff Castro attempted to do the practice calculations using Dr. Schmidt's method, she consistently arrived at the wrong answer. When she asked about the discrepancy, she was told, "trust me, this is the correct way to

calculate partial pressures of gases in the lungs." However, online practice problems also produced different answers. This created significant confusion and left Plaintiff Castro with no reliable source to verify what was being taught in class.

57. Plaintiff Barretto studied extensively for this course. He couldn't understand how he could dedicate so much time and effort to studying for A&P 1 and 2 and still have such low-test scores. Compared to his core anesthesia-based courses, such as anesthesia pharmacology or health assessment, there is a 20-30-point gap in his A&P exam scores. Although he consistently scored in the 80s and 90s on practice tests, he always scored in the 70s on Dr. Schmidt's exams, and his final exam scores were never released.

58. Throughout both semesters, Plaintiff Torrez obtained every optional textbook recommended for Dr. Schmidt's courses and thoroughly read the chapters that aligned with the content he taught in lectures. When concepts in the textbook were unclear, Plaintiff Torrez conducted extensive additional research, including reading medical references online and watching multiple educational videos to better understand the material. However, this often created more confusion because Dr. Schmidt frequently insisted that only his specific method of understanding or conceptualizing material was correct. He repeatedly stated that there were "multiple ways to reach the same answer," but emphasized that students should use his personal method because it was "easier" – even though many of them found that his explanations were not intuitive and did not align with traditional scientific instruction or the textbooks.

59. Plaintiffs regularly listened to Dr. Schmidt's lectures multiple times per week to catch every small nuance, as he routinely emphasized that "anything I say is fair game on the exam." This left students feeling anxious that even minor comments – such as movie references he made when describing the lungs – might appear on an exam.

60. Dr. Schmidt himself frequently struggled to demonstrate calculations consistently.

During recorded lectures, Dr. Schmidt often became confused when working through math problems, sometimes providing incorrect steps, backtracking, or abandoning the explanation altogether with comments such as, "Well… you'll figure it out." He regularly emphasized paying attention to small details in graphs and pictures he provided, but on multiple instances where Plaintiffs asked clarifying questions he responded with, "No one has ever asked me that before – I'm not sure, I'll have to get back to you," but no follow up was provided. Even when Plaintiffs studied the textbook graphs and practice problems in detail – spending hours analyzing each figure – Dr. Schmidt's exam questions often tested those same concepts in a completely reversed or unusual way, making it nearly impossible to recognize what was being asked or how to apply what students had learned.

61. Despite investing extraordinary time and effort into preparing for Dr. Schmidt's exams, there were major inconsistencies between the materials Plaintiffs studied, the practice resources available to them, and the grades Plaintiffs received on their assessments. These efforts often led to more confusion rather than clarity. On multiple occasions during the limited exam preparation and review sessions, Dr. Schmidt disagreed with the practice problem answers in the very textbooks he assigned – stating the textbook was wrong after the fact. This left students without a reliable or authoritative study reference.

62. This inconsistency became even more concerning when, several times during review sessions, Dr. Schmidt openly disagreed with concepts in Levitzky's Pulmonary Physiology – including calculation-based items. He withheld key formulas and conceptual steps that were essential to understanding the material, which created major gaps in students' learning. As a result, practice problems became far less effective or required exponentially more time to understand because the foundational information had never been taught.

63. Another example was his derivation of the Dead Space Volume equation. During

a lecture, Dr. Schmidt attempted to manipulate the formula further but skipped a crucial algebraic step. This caused widespread confusion, yet he moved on quickly to the next topic without clarification. It took students hours of independent study – using the textbook, online videos, and peer discussion – to discover the missing step and understand the equation fully. Despite never receiving a complete explanation in class, this formula still appeared on the exam. It is unclear how these and similarly problematic exam questions were graded.

**3. Misdirection**

64. Over both semesters, Dr. Schmidt often failed to provide clear, specific guidance on how to prepare for exams, and sometimes contradicted himself between his instructions and the actual exams when emphasizing certain materials. One striking example of this inconsistency occurred when Dr. Schmidt explicitly instructed the class to "know the arachidonic acid pathway inside and out" in preparation for an upcoming exam. Plaintiffs spent hours studying this pathway in detail, as did their classmates. Despite this, no questions related to this pathway appeared on the exam.

65. This kind of misleading guidance erodes trust between faculty and students, wastes valuable study time, and hinders students from preparing strategically. At the graduate level, where coursework is demanding, time is limited, and with exams in different courses every week, students must be able to rely on faculty guidance to align with exam content. When faculty deliberately emphasize topics that do not appear on exams while also testing obscure details not covered in lectures or textbooks, it creates an arbitrary and unfair assessment system. These practices contradict both the GPNA Handbook's promise of transparent and fair evaluation and the COA Standard E.1, which requires programs to fairly and accurately evaluate student performance.

66. Additionally, Dr. Schmidt encouraged students to consult multiple editions of the

textbooks to obtain more practice problems, even though he only supplied sample problems from the current edition. This further contributed to a lack of consistency. With so many versions, phrases, and question styles blending together, identifying which problems to rely on became challenging. He also frequently discouraged students from "memorizing practice questions," yet would simultaneously remark during office hours that a question most students missed was "directly from the book," implying they should have recognized its wording.

67. Overall, there was a significant disconnect between the materials Plaintiffs rigorously studied – including textbooks, lectures, peer notes, and online practice – and the questions that appeared on Dr. Schmidt's exams. Plaintiff Castro's performance on reliable practice resources consistently reflected strong comprehension (scoring in the 80–90% range). Yet her exam scores under Dr. Schmidt were consistently much lower, with no explanation or opportunity to understand why.

68. This misdirection is another indicator of a serious lack of alignment between the exams, the textbooks, up-to-date medical knowledge, and the board certification exam style, content, and emphases. It also further underscores the lack of transparency, predictability, fairness, and professional judgment in the evaluation process.

69. None of this is consistent with accepted academic practices. Other CRNA programs provide clear guidance on what content to focus on, including any specific equations or formulas to memorize. For example, National University does not require memorization of detailed lung/kidney formulas, while Union and Arkansas test on limited but well-defined formulas with sufficient context and explanation.

**4. Exam Questions Format and Test Construction**

70. The formatting of Dr. Schmidt's exam questions has several issues including: excessive focus on complex calculations disproportionate to the board licensing exam; use of

images that were flipped, rotated, and otherwise presented in ways intended to confuse students; questions with double negatives in the text; questions with extremely vague or confusing language; multiple choice and select-all-that-apply questions with more than five answer options, as many as 18; problems involving complex formulas with the functions out of order; extremely complex question prompts with detailed fact patterns and highly technical and precise multi-step medical / scientific calculations; and scenario-based questions that were overly intricate and read more like riddles than objective assessments of mastery of the subject matter. These overly contrived exams, paired with extreme secrecy, gave cover to arbitrary administrative actions.

71. There were additional issues with exam design. For example, Dr. Schmidt frequently took concepts from suggested practice problems, reworded them, and then made the previously incorrect answer choice the correct one on the exam. In one notable example, asbestosis was the correct answer for multiple restrictive lung disease practice problems he recommended – but appeared as an incorrect option on Plaintiffs' exams. These inconsistencies were arbitrary and, at times, seemed punitive, making the exams unpredictable and the study process destabilizing.

72. Dr. Schmidt's A&P exams do not align with board licensure-style examinations or with standard educational practices. Dr. Schmidt's A&P exams often failed to reflect the knowledge and skills emphasized in board licensure preparation. His exams frequently demanded interpretation of ambiguous, conflicting information and tracking his unsupported methods. The overall effect of these exams was that students were not evaluated on a stable, standardized body of knowledge. Instead, they were evaluated on their ability to decipher overly complex, inconsistently emphasized material that often conflicted with established sources. This pattern allows for arbitrary grading and undermines the validity of student evaluations.

73. This is not consistent with accepted academic practices. Exams at other CRNA

programs are primarily multiple choice, with a few "select all that apply" or fill-in-the-blank questions. Multiple-choice questions are limited to 4–5 answer choices for clarity and fairness. In well-designed assessments, questions are written to evaluate specific, identifiable learning outcomes so that each question can be answered accurately using a defined body of knowledge, leading to one single best answer. This structure ensures objectivity, consistency, and reliability in scoring, and allows for a fair evaluation of whether students have mastered the specific content being taught.

**5. Grading Practices**

74. Dr. Schmidt's grading practices were not transparent. Scores and curves were calculated inconsistently. Some students received curves while others did not. Some students reported receiving up to 10 points in a curve while others including Plaintiffs did not, raising concerns about fairness and uniformity. Although Dr. Schmidt stated that he graded each problem to the hundredth of the point, and that he used the students' scratch papers to score their answers, Plaintiffs were never allowed to review their graded scratch papers or original grade records. Plaintiffs were unable to access their own full educational records to address the following concerns:

- Were they given appropriate credit for correct answers?
- Amongst the different students, were the students given similar scores when they answered questions with similar answers?
- How were questions graded when the student's answer was consistent with the textbooks or established medicine?
- Was the instructor consistent with the textbooks, established science, or best practices in his exam questions and grading / scores?
- Were curves applied consistently to all students?

75. The syllabus for A&P II states that the total amount of possible points attainable in the course was 400. However, on Canvas, the total points attainable was 554. For the A&P I course, most entries are hidden and there is no apparent rhyme or reason to the grading system. For example, in Canvas for Exam 4, there is an entry that says "Exam 4 Assignments" with a grade assigned out of 100 points. However just below that is "Exam 4 Part 1" with 52 possible points and no grades posted, and "Exam 4, part 2" with 54 possible points and no grades posted. This concealment of grades did not occur in any other classes in this program or in any other academic or professional program attended by Plaintiffs, all of whom have completed prior nursing degrees and advanced certifications. Defendant's Faculty Handbook Section 2.1 (Grading) states: "Grading policies must be clearly outlined in the syllabus distributed at the beginning of a term. Faculty should adhere to grading policies as outlined." On page 10 of the course syllabus, Defendant stated that the syllabus is a "blueprint" and promises that that "students will be informed of any substantive changes concerning examinations."

**6. Exam reviews and remediation**

76. In Defendant's CRNA program, exam reviews varied significantly between courses, but the most inconsistent and limiting practices occurred in A&P. In their other courses, Plaintiffs were able to review their graded exams immediately after completing them, which allowed them to see incorrect answers and learn from mistakes. In contrast, A&P exam grades were not viewable promptly after submission, and the exams themselves were locked. During the first semester, Plaintiffs were allowed brief 10–15 minute reviews, but they were not permitted to take notes or ask questions during those reviews. Plaintiffs were not permitted to review their graded scratch papers, even during meetings or office hours. Students rarely received meaningful feedback, and individual reviews with Dr. Schmidt were inconsistent, incomplete, or unhelpful. At Texas Wesleyan, Plaintiffs were often forced to wait weeks or months to see their A&P

grades, and Dr. Schmidt's stated grading adjustments were vague and inconsistent. Several questions were acknowledged by Dr. Schmidt as incorrectly keyed, yet no clear or accurate final scoring was ever provided. Plaintiffs were never allowed to view their final adjusted scores or learn which answers were deemed correct.

77. Further compounding and reinforcing these harmful practices, Defendant does not allow students including Plaintiffs to have any remediation opportunities of any kind in this course.

78. This is not consistent with accepted academic practices. For example, at the CRNA programs at Union and Arkansas, students who score below an 80–85% on an exam are required to complete remediation, including reviewing the full exam with the professor within a set time frame to understand mistakes and improve. At other CRNA programs, students receive their exam scores immediately upon completion and can review which questions they answered correctly or incorrectly. Poorly written or statistically invalid questions are fairly thrown out.

**7. Willful blindness by administrators**

79. Other professors within the DNAP program maintained appropriate credentials and they provided appropriate exam reviews and timely, accurate feedback, but Dr. Schmidt and relevant administrators denied equivalent opportunities, creating a hostile and intimidating educational environment, especially for students with disabilities who relied upon reasonable accommodations. Dr. Schmidt's numerous improper practices were reinforced throughout the program with diminishment, diversion, intimidation, and secrecy, and are accepted and reinforced through the statements and practices of Defendant's Director, Dr. Terri Kane.

80. As Defendant's Program Director, Dr. Kane is responsible for closely monitoring program performance metrics such as attrition rates and diligently correcting any problems. However, instead of ensuring that the program operated with integrity, compliance, and fairness,

Dr. Kane told the students that she would defer to and uphold all of Dr. Schmidt's actions. And she did uphold and administratively reinforce his improper actions, both throughout the program and in her denials of the students' appeals of their dismissals. Dr. Kane looked away from and ratified Dr. Schmidt's unlawful policies and practices, while her employer the Defendant profited enormously from the Plaintiffs, to the Plaintiffs' great detriment and permanent harm.

81. Above its Program Director, Defendant Texas Wesleyan University had duties pursuant to its contract with the Plaintiffs and its many various contracted agreements to adhere to legal and accreditation standards, to closely monitor its programs' outcomes and performance metrics, and to identify, investigate, and address serious issues. Upon information and belief, over several years and in this instance, in its premier program, Defendant academically dismisses about 7% of each first-year cohort soon after spring semester final exams on the alleged basis that the students failed their A&P courses. However, no access to the exams, graded scratch papers, grading records, or numeric grades was ever provided to the dismissed students.

82. Although all of its first-year students who were academically dismissed from the program were alleged to have failed the same course, Defendant systematically refused and failed to provide typical student support resources for this particular course, unlike its treatment of other courses, as described more fully below. Dr. James Schmidt has been working for Defendant for about 16 years and upon information and belief of the Plaintiffs, this practice has been occurring for many years. Instead of appropriately treating this practice / scheme as a problem and taking corrective actions either proactively or when it was brought to their attention, Defendant's upper administration and leadership have ignored these practices and vigorously protected, defended, and reinforced them in its responses to Plaintiffs' academic appeals and attempted exercises of their rights pursuant to ADA, § 504, FERPA, contracts, and policies.

83. For example, the students properly requested access to inspect and review their

original grading records, including their graded scratch papers. During the academic appeal preparation period, Defendant's administration absolutely refused to allow Plaintiffs access to their own education records with changing, spurious, baseless, and inapplicable arguments.

84. This situation violates federal laws, Defendant's handbooks, and accreditation standards including SACSCOC standard 8.2.a, c which require that the institution identify expected outcomes, assess the extent to which it achieves these outcomes, and provide evidence of seeking improvement based on analysis of the results of student learning outcomes for each of its educational programs and academic and student services that support student success.

**8. Lack of Support and Learning Environment Culture**

85. There was a stark and troubling shift in academic support between Plaintiffs' first and second semesters in Defendant's DNAP program. During the Fall 2024 term, faculty engagement was fairly consistent, supportive, and clearly aimed at student success. Professors responded to questions promptly, encouraged collaborative learning, and created a classroom climate where seeking help was both welcomed and effective. Plaintiffs' advisors routinely reached out following suboptimal exam performances and offered structured guidance and emotional support that helped them course-correct and remain academically grounded and improving.

86. In contrast, the second semester was marked by an alarming decrease in that support. Faculty communication became limited and impersonal, and student questions were often met with dismissiveness rather than encouragement, especially in A&P II. Dr. Schmidt was often unavailable prior to exams, with limited office hours and appointments booked far in advance due to the number of struggling students trying to meet with him. Attempts to seek clarification were either brushed aside or responded to vaguely rather than constructively, making it difficult to even want to ask for help. This breakdown in academic rapport left students

including Plaintiffs without essential scaffolding and fostered a sense of isolation and defeat that directly impacted their ability to recover from academic challenges. Plaintiffs experienced the learning environment culture at Defendant's program as intimidating and unsupportive.

87. Although all or nearly all of Defendant's CRNA program academic dismissals are tied to this one first-year course sequence, no tutors, remediation, or second instructors were provided for this course, unlike all other courses in the program. Dr. Schmidt stated to Plaintiffs that a tutor would not be beneficial for his course because he did not allow students to rely on other sources, even if the material was correct according to other instructors or textbooks.

88. This is not consistent with accepted academic practices. Professors at National University, Union University, and University of Arkansas actively encourage students to reach out with questions and provide regular support – even in the days and hours leading up to exams. Students at these other programs described their courses as "challenging but manageable," with professors who made the material approachable, understandable, and fair. A student from Union University told Plaintiff Torrez: "My A&P professor did such a wonderful job of explaining things in an easy-to-understand way. He gave us a clear idea of what to expect for exams."

89. Defendant's practices violate SACSCOC accreditation standards 12.1 and 12.2 which require that the institution provides appropriate academic and student support programs, services, and activities consistent with its mission, and ensures an adequate number of academic and student support services staff with appropriate education or experience in student support service areas to accomplish the mission of the institution.

**9. Plaintiffs' Dismissals**

90. Although each Plaintiff had only received positive feedback and no warnings that they were at risk of dismissal, soon after taking the A&P II Final Exam on May 12, 2025, each Plaintiff was surprised to receive a phone call from Dr. Schmidt on or about May 20-22, 2025,

whereby he informed them that due to their unspecified A&P II final exam grades, they had failed out of the program. He declined their requests to review their exams or reconsider his decision. Within 24 hours, each Plaintiff subsequently received a brief email from Program Director Terri Kane with a vague notification of dismissal due to allegedly not meeting the program's academic requirements. The Plaintiffs experienced these notifications as shocking, confusing, distressing, and devastating.

91. Dr. Schmidt told Plaintiff Castro that there was no appeal process for graduate students, which she later learned was untrue. As a member of Defendant's University Judicial Board, he receives mandatory annual trainings on Defendant's policies, compliance obligations, and students' rights. Defendant knowingly provided false information to a student to prevent her from exercising her right to appeal.

92. On or about May 20, 2025, Plaintiff Koshy received a call from Dr. Schmidt stating that she had not passed his course and was dismissed from the program. He said she was right on the cusp of passing the semester and the cumulative final exam was her highest grade in the course, but it was not enough. He never gave her any numeric grades. Over about 90 minutes, she pled with Dr. Schmidt to reconsider. Later that day she checked RamLink and saw that her posted grade was a passing "C". She thought he had reconsidered and that she had passed. She was very surprised to receive a dismissal email from Dr. Kane a few days later on or about May 22, 2025. She checked RamLink again and sent a screenshot of the "C" to Dr. Kane. Kane replied that it was a "clerical error" and would be retroactively changed by the Registrar. Defendant then changed the grade to a "D" in RamLink. This experience caused Plaintiff Koshy to feel deeply betrayed, because before that call, Dr. Schmidt had always acted very encouraging towards her. He praised her hard work and improvement. He never told her she was in danger of failing.

93. Each Plaintiff experienced their dismissal as unexpected, abrupt, without adequate explanation, a betrayal, and personally and professionally devastating. Plaintiffs Torrez and Barretto had relocated to Fort Worth to attend the program and suddenly found their living arrangements upended. Each Plaintiff and their families experienced immediate adverse impacts and hardships due to this arbitrary academic action. In these notifications and contemporaneous discussions with Defendant, and ever since, Plaintiffs have never received their final numeric exam or semester grades, or any opportunity to understand how these results were reached.

**10. Cover-up and Retaliation Through Denial of Access to Education Records**

94. To prepare their dismissal / grade appeals, each Plaintiff requested access to their own education records by submitting written FERPA requests to Defendant in June 2025. Over the next six months, and to this day, Defendant has steadfastly refused to allow the Plaintiffs to meaningfully inspect and review their own exam records, scratch papers, and grade records with various vague, changing, and legally baseless rationales.

95. Defendants accused Plaintiffs of attempting to improperly use the FERPA process to appeal their dismissals pursuant to *Tarka v. Cunningham*, 917 F2d 890 (5th Cir. 1990). However, Plaintiffs reiterated and emphasized that they were merely attempting to access their own records to collect information so they could accurately prepare their appeal documents for submission to the separate dismissal appeal process.

96. Defendant claimed that Plaintiffs could not take and leave with any notes on the very complex exams for various reasons, including claims of test integrity concerns. However, the very limited test integrity exceptions to FERPA’s open and unconditional rights apply to situations of standardized, third-party proprietary exams and exams that are reused year after year – neither of which are present here.

97. Defendant claimed that Plaintiffs' score, curve, and numeric grade records were exempt from inspection because they were the instructor's personal notes. This position is contrary to the plain, broad definition of education records in FERPA as records that are directly related to a student and maintained by an educational institution or by a party working for one. It has been well-established law for decades that all students' completed exams, score sheets, and numeric grades are clearly education records, and not exceptions as "memory joggers" that are required by law at 34 CFR 99.3 to be kept in the sole possession of the maker; used only as a personal memory aid; and not accessible or revealed to any other person. A primary purpose of FERPA is to ensure that students can meaningfully inspect their records to understand the bases of their evaluations.

98. Defendant also claimed that Plaintiffs could not review or take notes about their own completed exams and grading records because they were the intellectual property of the Defendant. However, this contradicts FERPA which generally states that all students (or parents) at all schools that receive federal funds have the right to meaningfully inspect and review their own education records. Intellectual property claims do not override students' FERPA rights.

99. When discussing these matters, despite repeated written requests, Defendant only addressed the exams themselves and pointedly refused to address the Plaintiffs' rights to review their graded scratch papers and their original scoring, curve, and grading records.

100. During this time, Defendant produced documents to Plaintiffs' counsel that Defendant described as a newly created compilation of the Plaintiffs' scores for each problem on the spring final exam. However, this is another violation of FERPA according to Guidance Documents from the U.S. Department of Education's Student Privacy Policy Office for over 30 years in that it is not sufficient for a school to refer a student to other records that summarize their test results, or to create new documents to justify withholding original records.

101. In response to Plaintiffs' targeted FERPA requests, Defendant insisted on a series of excessive, vague, and changing restrictions on the logistics of the exam reviews. Defendant completely prohibited Plaintiffs' abilities to take and leave with notes or record audio only, while Defendant stated an intent to arbitrarily interfere with and aggressively terminate attempted review sessions. Defendant also implicitly threatened to further harm Plaintiffs by instigating interpersonal conflict in an openly hostile review environment, manufacturing enormous stress, potentially damaging or clouding Plaintiffs' impeccable reputations, and diverting focus from the true issues herein.

102. Finally, Defendant improperly required that Plaintiffs each sign a broad NDA, waiver, and release as an unlawful condition and constraint on Plaintiffs' exercise of their federal statutory rights.

103. Although Plaintiffs specifically requested to review all nine of their A&P exams from both semesters, as the A&P courses formed the bases of their dismissals, then offered to only focus on the two final exams, Defendant only ever agreed to make the A&P II final exam available to students, and then only under such unreasonable conditions, legally baseless restrictions, and implicit threats that they fully frustrated the purpose of the attempted reviews in violation of contract, FERPA, and accreditation standards.

104. Defendant unlawfully conditioned Plaintiffs' statutory and contractually guaranteed right of access to their own education records on a coercive ultimatum. When the Plaintiffs refused to waive their rights, Defendant unilaterally cancelled the attempted reviews, and no access to these records was ever allowed.

105. In its official handbook and syllabus policies, recruitment materials, accreditation pledges, and acceptance of federal financial aid, Defendant contractually promised to Plaintiffs the right to access their education records. In violation of this contract, Defendant invented new

excessively restrictive and unlawful conditions and then used the Plaintiffs' refusal to agree to those conditions as a pretext to block their exercise of their FERPA rights and ultimately deny their rights to Due Process. This is how Defendant used claims of concerns for test integrity and FERPA exceptions to actively conceal evidence of deceptive trade practices.

**11. Improper Attrition and Clinical Site Assignments**

106. Upon information and belief, all students who fail or withdraw from this program due to failing grades in the first two semesters are doing so because of only one instructor, who is dismissing multiple students each year without any transparency. In Spring 2025, eight of 107, or 7% of the class of 2027 cohort were dismissed in this manner. In contrast, Baylor's program has an overall average attrition rate of about 5% for the entire three-year duration of its program, and that rate includes academic and all other causes of attrition. The overall attrition rate of the CRNA program at Texas Christian University ranges from 2-6%. The overall attrition rate of the CRNA program at UTHealth Houston ranges from 0-2%. The CRNA program at UT San Antonio is new and has only admitted two cohorts to date. Of these, they have a 0% attrition rate.

107. Defendant's extremely unusual attrition concentrated in a single first-year course appears to correlate with the limited number of second-year clinical placements available, due to the statements and practices of program administration. Confusion and administrative issues regularly occur around clinical site assignments and logistics each year. Further, Plaintiff Cox was told by another student that an administrator stated that they 'wouldn't know where her clinical assignment would be until after Spring semester because they needed to see which sites would open up spots, but not to worry because they anticipated several students failing.'

**12. Disparate Application of Policies**

108. The treatment of the Plaintiffs by Defendants described herein stands in stark contrast to Defendant's treatment of students accused of cheating on an exam during the same

school year. In that situation, Defendant did not faithfully apply its own dismissal policies, accreditation standards, and national board reporting requirements to the students who engaged in cheating, and an instructor resigned under pressure instead. Plaintiffs herein disparately received the harshest sanction possible – dismissal from the program – without any wrongdoing on their part or adequate due process by Defendant.

109. Defendant's program policies and practices operated as a pattern or practice of denying equal opportunity, transparency, and fairness to Plaintiffs and others similarly situated in violation of COA Standard G.4, federal laws, and the terms of their contracts.

**E. Dismissals and Consequential Harm**

110. Each Plaintiff was generally academically successful in all courses except the tainted A&P sequence. Each suffered abrupt dismissal without due process, resulting in permanent loss of the CRNA career pathway as no other CRNA program will accept an applicant with a prior academic dismissal. Reapplication and repetition of the first year is not a good-faith remedy: it would require duplicative payment for completed A/B coursework, expose Plaintiffs to further retaliation, and cause extreme delay.

111. **Plaintiff Cox.** Tuition and related expenses approximately $44,920; past lost wages and out-of-pocket costs (relocation, childcare, supplies, transportation, and related expenses) totaling over $252,000; and future lost earning capacity as a CRNA (substantial salary differential between CRNA compensation and continued RN earnings over her remaining career years, to be proven with reasonable certainty by expert testimony at trial). Additional damages include reputational harm, mental anguish, and emotional distress recoverable under applicable state-law claims.

112. **Plaintiff Castro.** Tuition and related expenses approximately $44,191.80 plus textbooks, supplies, professional costs, childcare, transportation, and past lost wages totaling

over $234,000 in documented out-of-pocket and opportunity costs to date; future lost earning capacity as a CRNA (substantial salary differential, to be proven with reasonable certainty by expert testimony); reputational harm and mental anguish recoverable under state claims.

113. **Plaintiff Koshy.** Tuition and related expenses approximately $49,360 plus textbooks, supplies, and past lost wages totaling over $230,000 in documented costs; future lost earning capacity as a CRNA (substantial salary differential over remaining career years, to be proven with reasonable certainty); reputational harm and mental anguish recoverable under state claims.

114. **Plaintiff Torrez.** Substantial tuition, past lost wages and related expenses (including documented costs exceeding $150,000 from relocation, living expenses, supplies, and lost wages); future lost earning capacity as a CRNA (substantial salary differential, to be proven with reasonable certainty by expert testimony); reputational harm and mental anguish recoverable under state claims.

115. **Plaintiff Barretto.** Tuition and related expenses approximately $83,127 plus relocation and past lost wages totaling over $238,000 in documented costs; future lost earning capacity as a CRNA (substantial salary differential over remaining career years, to be proven with reasonable certainty); reputational harm and mental anguish recoverable under state claims (including as a veteran and to his family).

116. All Plaintiffs also incurred attorneys' fees, mental-health treatment costs, and ongoing emotional distress. Defendant has been unjustly enriched by retaining tuition and fees while denying the promised good faith educational and credentialing services.

### F. Administrative Process

117. Following their dismissals from the DNAP program in May 2025, each Plaintiff timely pursued and exhausted the University's internal two-step administrative appeal process in

accordance with the DNAP program's published policies and the Graduate Student Handbook. Each Plaintiff submitted a detailed written appeal first to the Program Director, and then the Provost, comprehensively addressing the facts and issues set forth above. This included the deceptive over-enrollment scheme (violating COA A.10, A.11, F.1); misrepresentations in recruitment materials (violating G.2);, denial of reasonable accommodations (violating G.4); assessment format, grading, misdirection, lack of support, lack of alignment with board exams, and procedural irregularities in Dr. Schmidt's A&P courses (violating G.2, G.5, H.1.1.3); serious concerns about the validity of the science and medicine taught in the A&P courses; important deficiencies in and misrepresentations about the instructor's credentials and sources; lack of transparency and access to educational records (violating G.2 and FERPA); Canvas notification anomalies documenting record tampering, instability, and unreliability; disparate treatment; and the arbitrary and capricious nature of the dismissals. The appeals also documented the severe professional, financial, reputational, and personal harms caused by the dismissals and requested reinstatement with full credit. Each appeal expressly invoked the foregoing COA accreditation standards and FERPA issues and demonstrated how Defendant's actions violated them.

118. Defendant's Student Handbook does not provide for a process for appeals of dismissals. Thus, Plaintiffs followed the two-level grade appeal process. After extended delays due to their unsuccessful attempts to access their records, as described in detail above, Plaintiffs submitted their appeals to Defendant's Program Director Dr. Terri Kane on December 5, 2025. They received Kane's responses on February 18, 2026, denying their appeals. They submitted their appeals to Defendant's Provost Hector Quintanilla on March 4, 2026. They received their denials from the Provost on April 27, 2026.

119. While the Plaintiffs' appeal documents generally followed similar topical outlines and contained a small amount of duplication, particularly in their discussions of FERPA issues

and relevant regulations, and similar exhibits, their appeals were all highly individualized to each Plaintiff's specific experiences. In contrast, the responses received from Defendant were brief, vague, boilerplate, did not address major issues substantively or at all, and contained generic text blocks that did not apply to arguments raised by individual students. In all of their responses, except for briefly acknowledging Plaintiff Koshy's otherwise unexplained grade change from a "C" to a "D" as "an unfortunate clerical error," Defendant's directors Kane and Quintanilla sided with Defendant in each and every instance, and they did not take responsibility for anything that has occurred herein.

120. Through Kane and Quintanilla, Defendant only referenced Plaintiffs' letter grades and refused to provide any numeric exam or semester grades. Defendant's responses to the appeals were dismissive, conclusory, and did not meet facts with facts. In its responses to each Plaintiff at both levels, Defendant did not ever address the fact that the students were dismissed due to allegedly failing a course where 25% of the semester grade is missing, and the grading practices substantially deviated from the syllabus and standard academic practices.

121. Plaintiff Castro submitted a 22-page appeal document with 106 pages of exhibits. Her appeal addressed each of the experiences and concerns described herein. Kane denied the appeal with a five-page response with the only difference being a paragraph regarding "Health Related Complaints." Almost all of the remaining content is exactly the same as the denials received by the other four Plaintiffs herein.

122. Plaintiff Castro next submitted her appeal to Defendant's Provost Quintanilla with her original appeal packet and a new four-page cover letter. Quintanilla's three-page response contains large amounts of blank space and boilerplate language. He did not substantively respond to the issues she raised, and he misrepresented the facts. For example, as to Plaintiff's denial of an interactive process for disability accommodations, Quintanilla wrote:

> "While I understand you contend that you were provided with erroneous information by the instructor, even if this occurred, the University's processes for seeking an accommodation – as well as available accommodations - are well documented on its website and other resources, including the program handbook and orientation material."

However, the evidence will show that the 'erroneous information' was in fact in the syllabus, on Defendant's website, and directly enforced by the instructor, which Plaintiff reasonably relied upon when she unexpectedly needed disability accommodations after the program started.

123. Plaintiff Cox submitted a 17-page appeal document with 96 pages of exhibits to Kane. After it was denied, she next submitted an appeal to Defendant's Provost Quintanilla with her original appeal packet and a new three-page cover letter.

124. Plaintiff Koshy submitted a 23-page appeal document with 103 pages of exhibits to Kane. After it was denied, she next submitted an appeal to Defendant's Provost Quintanilla with her original appeal packet and a new three-page cover letter.

125. Plaintiff Torrez submitted a 25-page appeal document with 101 pages of exhibits to Kane. After it was denied, she next submitted an appeal to Defendant's Provost Quintanilla with her original appeal packet and a new two-page cover letter.

126. Plaintiff Barretto submitted a 14-page appeal document with 96 pages of exhibits to Kane. After it was denied, he next submitted an appeal to Defendant's Provost Quintanilla with his original appeal packet and a new two-page cover letter.

127. While each Plaintiff submitted a detailed, individualized appeal to the Program Director, when placed side by side, Defendant's denials of Plaintiffs' appeals through its Program Director on February 18, 2026, are nearly identical, word-for-word. Except for the minor variations in Plaintiffs Castro's and Koshy's denials noted above, they are entirely generic and contain no variations amongst them.

128. While each Plaintiff next submitted a detailed, individualized appeal to the Provost, when placed side by side, Defendant's denials of Plaintiffs' appeals through its Provost on April 27, 2026, are nearly identical, word-for-word. They contain only very minor variations of phrasing amongst them.

129. While academic programs typically have a three-level appeal protocol with the institution's top official at the third level, Defendant has only a two-level appeal protocol that does not reach its top official. Defendant's uniform denials of Plaintiffs' appeals constitute its final administrative decisions on these matters. The administrative process was inadequate, failed to provide meaningful review or due process, and did not cure the underlying violations of accreditation standards (including COA Standard G.7, which requires that the program "…processes complaints, grievances, and appeals in a timely and equitable manner affording due process"). This further evidences the arbitrary and capricious nature of the dismissals and supports Plaintiffs' claims of deceptive practices and procedural unfairness.

**H. Conclusion**

130. Defendant is operating a large-scale deceptive over-enrollment scheme, whereby it profits from CRNA students while allowing an instructor and a program director to secretively, arbitrarily, and capriciously dismiss students in fraudulent and discriminatory ways.

## V. CAUSES OF ACTION

### Count One: Violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et Seq.

131. Plaintiffs re-allege all preceding paragraphs.

132. Plaintiffs are each qualified individuals with disabilities, as defined under the Americans with Disabilities Act ("ADA"), who notified Defendant of their disabilities and requested reasonable accommodations for educational access and participation.

133. Defendant is a recipient of federal funds and a covered public accommodation

subject to the ADA.

134. Defendant failed to provide Plaintiffs equal access to educational programs and activities, discriminated against Plaintiffs on the basis of disability, failed to implement reasonable accommodations, and refused to engage in a good-faith interactive process, resulting in interference, disparate impact, exclusion, and retaliatory actions culminating in Plaintiffs' dismissals and due process failures in their appeal processes.

135. As a direct and proximate result, Plaintiffs seek injunctive and declaratory relief, including reinstatement, and attorneys' fees and costs where available. No compensatory damages are sought under this Count.

**Count Two: Violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**

136. Plaintiffs re-allege all preceding paragraphs.

137. Defendant receives federal financial assistance and acted with deliberate indifference and intentional discrimination by refusing to accommodate Plaintiffs' known disabilities, denying meaningful access, causing their dismissals, and interfering with their exercise of their rights.

138. Plaintiffs seek economic compensatory damages (tuition, out-of-pocket expenses, past lost wages, and future lost earning capacity where proven with reasonable certainty), injunctive relief, and attorneys' fees.

**Count Three: Retaliation in Violation of the ADA and Section 504**

139. Plaintiffs re-allege all preceding paragraphs.

140. Plaintiffs engaged in protected activity (requesting accommodations, seeking records access, and pursuing appeals). Defendant retaliated through adverse actions including increased scrutiny, misdirection, interference, blocked access, and upheld dismissals.

141. Plaintiffs seek economic compensatory damages (where available), injunctive

relief (including reinstatement), and attorneys' fees. No emotional distress or punitive damages are sought under this Count.

**Count Four: Violations of the Texas Deceptive Trade Practices Act (DTPA), Tex. Bus. & Com. Code §§ 17.41 et seq.**

142. Plaintiffs re-allege all preceding paragraphs.

143. Plaintiffs are consumers under the DTPA who sought or acquired goods or services from Defendants by providing valuable consideration in the way of tuition or services, and the purchase of these educational products and services are the basis of Plaintiffs' claims.

144. Defendants are persons under the DTPA.

145. Plaintiffs each delivered to the Defendant a demand letter detailing their list of DTPA specific claims, including the amount of damages and including reasonable attorney's fees and expenses to the date of the letter, over 60 days prior to the filing of this action. Therefore, all conditions precedent to Plaintiffs' recovery in this action have been performed or have occurred.

146. Defendant's recruitment and programmatic misrepresentations and false claims concerning board passage rates, attrition rates, enrollment capacity, legal and accreditation compliance (including FERPA and COA standards), program quality, instructor credentials, number of clinical positions available, and student support systems were false, misleading, deceptive acts and practices were made knowingly or recklessly to induce Plaintiffs to purchase educational services. These misrepresentations violated Tex. Bus. & Comm. Code 17.50 and COA Standard G.2 and constitute a pattern of deceptive trade practices.

147. Defendant's conduct represented that its goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have. Defendant's conduct represented that its goods or services have a particular standard, quality, or

grade that they do not. Defendant failed to disclose information about its goods or services which was known at the time of the transaction, and such failure to disclose such information was intended to induce the consumer into a transaction into which the Plaintiffs would not have entered had the information been disclosed. Defendant knowingly or intentionally engaged in false, misleading, or deceptive practices in the transactions described above, producing damages to Plaintiffs. Defendant's conduct took advantage of Plaintiffs' lack of ability to independently verify its representations prior to enrollment in the program to a grossly unfair degree so as to be a producing cause of damages to Plaintiffs.

148. As a result of Defendants' conduct, Plaintiffs have been injured in that they paid tuition, purchased books and supplies, incurred debt, lost a year of significant income and benefits, relocated, commuted, attended classes, endured extraordinary stresses, and suffered permanent reputational harm and loss of their highly respected and remunerative careers in reliance on Defendant's representations. Plaintiffs also suffered mental anguish due to Defendant's conduct.

149. Defendant is required to restore to Plaintiffs any money or property that was illegally acquired in violation of the Texas Deceptive Trade Practices Act. Plaintiffs seek treble damages.

150. To pursue this claim against defendants, Plaintiffs had to retain the Velie Law Firm as attorneys and agreed to pay that firm reasonable fees for their services in maintaining Plaintiffs' claims. Plaintiffs are entitled to recover those fees from Defendant under Section 17.50(d) of the Texas Business and Commerce Code.

**Count Five: Common Law Fraud**

151. Plaintiffs re-allege all preceding paragraphs.

152. Defendant made materially false representations and omissions regarding program

quality and metrics, legal and accreditation compliance (including FERPA and COA standards), attrition rates, instructor credentials, and academic fairness with knowledge of their falsity or reckless disregard. Defendant intended that Plaintiffs rely on them when enrolling and continuing. Plaintiffs justifiably relied and suffered injury (tuition loss, lost wages, lost future CRNA earnings, emotional distress, and reputational harm).

153. Plaintiffs are hereby entitled to restitution of the monetary benefits conferred unto Defendants, where under Texas law, one who is induced by fraud to enter into a contract may be entitled to an equitable remedy of restitution that would restore him or her to the position s/he would have been in had s/he not been the victim of fraud.

154. Plaintiffs seek economic damages, mental anguish damages, and exemplary damages.

**Count Six: Negligent Misrepresentation**

155. Plaintiffs re-allege all preceding paragraphs.

156. In the course of their business, Defendant negligently supplied false information regarding program quality, costs, legal and accreditation compliance (including COA standards), attrition rates, and adherence to governing policies.

157. Plaintiffs justifiably relied on Defendant's representations in deciding to purchase educational products and services from Defendant, and they entrusted their careers and reputations to Defendant by enrollment in its program. Plaintiffs did not receive the quality of education promised including over enrollment, abnormal attrition practices, improper grading and records keeping and access, sham due process, and arbitrary administrative actions, and Defendant's negligent misrepresentations proximately caused Plaintiffs' injuries and damages.

158. Plaintiffs are entitled to a restoration of the monetary benefits conferred unto Defendant, where these monetary benefits were wrongfully secured by Defendant and it would

be unconscionable for Defendant to retain them.

**Count Seven: Breach of Contract**

159. Plaintiffs re-allege all preceding paragraphs.

160. A contract was created when Defendant, a private university agreed to provide educational opportunities to the Plaintiffs when they enrolled. Defendant was bound to offer the curriculum and instruction necessary for the Plaintiffs to achieve their degrees in exchange for tuition and successfully complete the requirement necessary to obtaining their degrees under legal compliance assurances, student handbook, catalog, policies, and COA-incorporated accreditation standards. Defendant breached by failing to provide promised transparency, accommodations, record access, fair grading, ongoing faculty feedback (H.1.1.3), academic integrity (G.5), truth and accuracy in grading and recruiting (G.2), due process in appeals (G.7), equitable and nondiscriminatory policies (G.4), and adequate resources (A.10, A.11, F.1), and by operating the over-enrollment scheme.

161. Plaintiffs seek economic damages, including restitution of tuition and fees, loss of future income, attorney's fees, costs, and specific performance through reinstatement.

**Count Eight: Promissory Estoppel**

162. Plaintiffs re-allege all preceding paragraphs.

163. Defendants promised to provide Plaintiffs with an education program operated in compliance with legal and accreditation requirements, student handbook, catalog, and policies. Defendant breached by failing to provide promised transparency, accommodations, record access, fair grading, ongoing faculty feedback (H.1.1.3), academic integrity (G.5), truth and accuracy in grading and recruiting (G.2), due process in appeals (G.7), equitable and nondiscriminatory policies (G.4), and adequate resources (A.10, A.11, F.1), and by operating the

over-enrollment scheme. Plaintiffs, qualified aspiring CRNAs, justifiably and foreseeably relied on these promises. Injustice can be avoided only by enforcing Defendant's broken promises.

164. Plaintiffs seek economic reliance damages.

**Count Nine: Unjust Enrichment / Restitution**

165. Plaintiffs re-allege all preceding paragraphs.

166. Defendant obtained benefits from Plaintiffs in the forms of tuition, fees, and other costs, while it disseminated misrepresentations and failed to deliver the promised standard education, fair process, and credentials in compliance with legal requirements and accreditation standards. Retention of these benefits under the circumstances is unjust.

167. Plaintiffs seek full restitution and disgorgement of all amounts paid plus interest.

## VI. NOTE ON ARBITRARY AND CAPRICIOUS ACADEMIC ACTION

168. Defendant's program and grading irregularities, denial of record access, failure to accommodate, and surreptitious dismissals lacked any reasonable academic basis, deviated from accepted norms and from multiple COA accreditation standards (including G.2, G.4, G.5, G.7, H.1.1.3, A.10, A.11, and F.1), and were arbitrary and capricious. Plaintiffs seek relief for the adverse impacts of these actions through the counts listed above.

169. The Supreme Court has held that federal courts should not override grading and similar decisions about academic merit unless they so substantially depart from accepted academic norms as to demonstrate a failure to exercise professional judgment. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985). Federal courts strongly disfavor claims that require judges to second-guess judgments about the academic quality of a student's work. See, e.g., *Keys v. Sawyer*, 353 F. Supp. 936, 940 (S.D. Tex. 1973) ("The federal judiciary should not adjudicate the soundness of a professor's grading system, nor make a factual determination of the individual grades."). In a Texas case, the Fifth Circuit adopted the presumption of deference to academic

decisions of private universities unless such decisions substantially depart from academic norms, citing *Ewing. Sugg v. Midwestern University, et. al*. 105 F. 4th 345 (5th Cir. 2024).

170. Here, Defendant's conduct in its policies, patterns, and practices clearly demonstrates a failure to exercise professional judgment, and its academic and business practices clearly substantially deviate from common academic practices. Plaintiffs allege herein that Defendant operates a highly profitable, fraudulent, and discriminatory scheme that until now has escaped accountability through obfuscation, intimidation, and hiding behind the deference usually afforded universities.

171. Defendant employs an inadequately credentialed instructor to run a course sequence that functions as a covert mechanism to arbitrarily and discriminatorily reduce intentional over-enrollment and produce a second-year cohort aligned in size with the limited number of clinical site assignments it has available through third parties, after a full year of tuition has been collected and all other options for students are foreclosed. The A&P course content and exams materially deviate from accepted science and medical authorities. The exams are rife with issues, including the validity of questions' content and formats, grading practices, hiding records, and records tampering.

172. Defendant blocked access to Plaintiffs' own education records that allegedly caused the dismissals on the basis of knowing misrepresentations, including false claims of exam reuse and inapplicable FERPA exceptions. There is no test security justification for preventing dismissed students from taking notes about their own records. Defendant used total secrecy to hide the original grading records and results altogether, in violation of the Plaintiffs' rights and in breach of their contracts. Further, when presented with extensive documentary evidence of repeated records tampering, Defendant responded with willful blindness.

173. Defendant had a duty to investigate these irregularities and provide a substantive

response. Instead, the brief conclusory appeal responses and Defendant's conduct throughout this program substantially and materially depart from accepted academic norms so as to deprive the Plaintiffs of their substantive due-process rights according to their contracts.

174. Because of the specificity, intentionality, and pervasiveness of the wrongdoing described herein, Defendant's actions, omissions, and exploitative scheme are not due any judicial deference whatsoever.

## VII. NOTICE REGARDING FERPA

175. Plaintiffs have filed complaints with the U.S. Department of Education regarding Defendant's violations of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g. While these violations are not presented as a separate cause of action, Defendant's repeated denial of timely and meaningful access to educational records for purposes of academic reviews and appeals, including for students with documented disabilities entitled to accommodations, forms part of the factual bases for Plaintiffs' claims of deceptive trade practices, procedural unfairness, breach of contract, arbitrary and capricious action, and discrimination, interference, and retaliation under the ADA and Section 504.

## VIII. JURY DEMAND

176. Plaintiffs demand a jury trial on all issues in accordance with Fed. R. Civ. P. 38.

## PRAYER

WHEREFORE, Plaintiffs respectfully request that the Defendant be cited to appear and answer, and that on final hearing, Plaintiffs have:

a. Restitution;

b. Economic damages;

c. Additional DTPA damages of three times each Plaintiff's economic and mental anguish damages;

d. Attorney's fees through entry of final judgment in this action;

e. Prejudgment and post judgment interest;

f. Costs of this suit;

g. Injunctive and equitable relief compelling compliance with the ADA, § 504, FERPA, accreditation standards, and Defendant's own policies; and

h. Any other relief that the Court finds proper.

DATED: OCTOBER 2, 2026

Respectfully submitted,

**Velie Global Law Firm**

*/s/ Jon Velie*
Jon Velie
Texas Bar No. 24147230
Jon@velielaw.com
555 Republic Drive, Suite 505
Plano, Texas 75074
(469) 606-9555

/s/ *Kurt S. Elieson*
Kurt Elieson
Texas Bar No. 06521100
Email: Kurt@eliesonlaw.com
2340 E. Trinity Mills Road, Suite 300
Carrollton, Texas 75006
Telephone: 940-300-3801

*/s/ Amelia Lafont*
Amelia Lafont
Arkansas Bar No. 2015223
*Pro Hac Vice application forthcoming*
lafontlawoffice@protonmail.com
PO Box 1362
Gentry, AR 72734
(501) 237-0345